**Fill in this information to identify the case:**

Debtor 1  Daniel LaSage

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court  Northern District of Illinois

Case number: 18-31804

FILED
U.S. Bankruptcy Court
Northern District of Illinois
12/21/2018
Jeffrey P. Allsteadt, Clerk

EXHIBIT A

## Official Form 410
## Proof of Claim

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1: Identify the Claim

**1. Who is the current creditor?**
Windmill Creek Units 2 & 3 Homeowners Association
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**
☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Windmill Creek Units 2 & 3 Homeowners Association
Name

Keay & Costello, P.C.
128 S. County Farm Road
Wheaton, IL 60187

Contact phone  630-690-6446

Contact email  ben@keaycostello.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one): _____

Where should payments to the creditor be sent? (if different)

_____
Name

Contact phone _____

Contact email _____

**4. Does this claim amend one already filed?**
☑ No
☐ Yes. Claim number on court claims registry (if known) _____  Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**
☑ No
☐ Yes. Who made the earlier filing? _____

Official Form 410                        Proof of Claim                        page 1

**Part 2: Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. Do you have any number you use to identify the debtor? | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |
| 7. How much is the claim? | $ __689.00__   **Does this amount include interest or other charges?**<br>☐ No<br>☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
| 8. What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as healthcare information.<br><br>__Association common expense__ |
| 9. Is all or part of the claim secured? | ☐ No<br>☑ Yes. The claim is secured by a lien on property.<br>**Nature of property:**<br>☑ Real estate.   If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:**   __Association lien__<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:** $ __225000.00__<br>**Amount of the claim that is secured:** $ __689.00__<br>**Amount of the claim that is unsecured:** $ __0.00__   (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:** $ _____<br><br>**Annual Interest Rate** (when case was filed)   _____ %<br>☑ Fixed<br>☐ Variable |
| 10. Is this claim based on a lease? | ☑ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____ |
| 11. Is this claim subject to a right of setoff? | ☑ No<br>☐ Yes. Identify the property: _____ |

Official Form 410   Proof of Claim   page 2

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No<br>☐ Yes. Check all that apply: | Amount entitled to priority |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies | $ |
| | * Amounts are subject to adjustment on 4/1/19 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157 and 3571.

Check the appropriate box:

☐ I am the creditor.
☑ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   12/21/2018
                   MM / DD / YYYY

/s/ Benjamin J. Rooney
_____
Signature

Print the name of the person who is completing and signing this claim:

Name        Benjamin J. Rooney
            First name    Middle name    Last name

Title

Company     Keay & Costello, P.C.
            Identify the corporate servicer as the company if the authorized agent is a servicer

Address     128 S. County Farm Road
            Number Street
            Wheaton, IL 60187
            City   State   ZIP Code

Contact phone  630-690-6446        Email  kim@keaycostello.com

# Statement

Windmill Creek Units 2 and 3 HOA
c/o BP Management Services Inc
411 South State Street Unit B
Belvidere Il 61008

| Date |
|---|
| 12/12/2018 |

**To:**
Daniel & Denise LaSage
74 Rotterdam Dr
Antioch IL 60002

Please make checks payable to Windmill Creek HOA

| E-mail | Fax # | Phone # | Amount Due | Amount Enc. |
|---|---|---|---|---|
| jloveridge111@gmail.com | 866-607-5419 | 779-552-8719 | $627.00 | |

| Date | Transaction | Amount | Balance |
|---|---|---|---|
| 10/31/2018 | INV #24451. October late fee | 50.00 | 351.00 |
| 11/01/2018 | INV #24053. | 38.00 | 389.00 |
| 12-21-18 | BK Legal fee - letter & proof of claim | 300.00 | 689.00 |

| CURRENT | 1-30 DAYS PAST DUE | 31-60 DAYS PAST DUE | 61-90 DAYS PAST DUE | OVER 90 DAYS PAST DUE | Amount Due |
|---|---|---|---|---|---|
| 150.00 | 88.00 | 88.00 | 88.00 | 213.00 | 689.00 |

Page 2

# Statement

Windmill Creek Units 2 and 3 HOA
c/o BP Management Services Inc
411 South State Street Unit B
Belvidere Il 61008

| Date |
|---|
| 12/12/2018 |

**To:**
Daniel & Denise LaSage
74 Rotterdam Dr
Antioch IL 60002

Please make checks payable to Windmill Creek HOA

| E-mail | Fax # | Phone # | Amount Due | Amount Enc. |
|---|---|---|---|---|
| jloveridge111@gmail.com | 866-607-5419 | 779-552-8719 | $627.00 | |

| Date | Transaction | Amount | Balance |
|---|---|---|---|
| 04/30/2017 | Balance forward | | |
| 05/01/2017 | INV #19836. | 46.00 | 46.00 |
| 05/01/2017 | PMT #172. payment | -46.00 | 92.00 |
| 05/30/2017 | PMT #176. May payment | -46.00 | 46.00 |
| 06/01/2017 | INV #20075. | 46.00 | 0.00 |
| 07/01/2017 | INV #20309. | 46.00 | 46.00 |
| 07/31/2017 | PMT June payment | -46.00 | 92.00 |
| 08/01/2017 | INV #20530. | 46.00 | 46.00 |
| 08/29/2017 | PMT #180. August payment | -46.00 | 92.00 |
| 09/01/2017 | INV #20758. | 46.00 | 46.00 |
| 10/01/2017 | INV #20983. | 46.00 | 92.00 |
| 10/28/2017 | PMT #187. July payment | -46.00 | 138.00 |
| 11/01/2017 | INV #21240. | 46.00 | 92.00 |
| 11/30/2017 | INV #21871. November late fee | 50.00 | 138.00 |
| 12/01/2017 | INV #21467. | 46.00 | 188.00 |
| 12/31/2017 | INV #21888. December late fee | 50.00 | 234.00 |
| 01/01/2018 | INV #21699. | 46.00 | 284.00 |
| 01/31/2018 | INV #22133. January late fee | 50.00 | 330.00 |
| 02/01/2018 | INV #21955. | 38.00 | 380.00 |
| 02/24/2018 | PMT #190. February payment &remainder on ($26.00)Jan 2018, ($46.00)Sept 2017,($46.00)Oct 2017,($46.00)Nov 2017, ($46.00) Dec 2017 | -248.00 | 418.00 170.00 |
| 03/01/2018 | INV #22196. | 38.00 | 208.00 |
| 04/01/2018 | INV #22424. | 38.00 | 246.00 |
| 04/06/2018 | PMT #195. Balance & March & April payment | -285.00 | -39.00 |
| 05/01/2018 | INV #22653. | 38.00 | -1.00 |
| 05/22/2018 | PMT #101. May payment | -38.00 | -39.00 |
| 06/01/2018 | INV #22880. | 38.00 | -1.00 |
| 07/01/2018 | INV #23118. | 38.00 | 37.00 |
| 07/31/2018 | INV #23526. July late fee | 50.00 | 87.00 |
| 08/01/2018 | INV #23350. | 38.00 | 125.00 |
| 08/31/2018 | INV #23990. August late fee | 50.00 | 175.00 |
| 09/01/2018 | INV #23587. | 38.00 | 213.00 |
| 09/30/2018 | INV #23991. September late fee | 50.00 | 263.00 |
| 10/01/2018 | INV #23818. | 38.00 | 301.00 |

| CURRENT | 1-30 DAYS PAST DUE | 31-60 DAYS PAST DUE | 61-90 DAYS PAST DUE | OVER 90 DAYS PAST DUE | Amount Due |
|---|---|---|---|---|---|
| 150.00 | 88.00 | 88.00 | 88.00 | 213.00 | |

Page 1

ABOVE SPACE FOR RECORDER'S USE ONLY

**4241393**

COPY

LAKE COUNTY RECORDER
NOV 17 1998

# DECLARATION FOR WINDMILL CREEK
## UNIT 2 AND UNIT 3

(75%) of the Lots to the commencement and prosecution of the proposed action. This Section shall not apply to (a) actions brought by the Association to enforce the provisions of this Declaration, the By-Laws or rules and regulations adopted by the Board (including, without limitation, an action to recover Charges or to foreclose a lien for unpaid Charges) or (b) counterclaims brought by the Association in proceedings instituted against it.

## ARTICLE SIX
### Assessments

6.01 <u>PURPOSE OF ASSESSMENTS</u>: The assessments levied by the Association shall be limited to the purposes of maintaining the Community Area, including, without limitation, the Landscape Easements and Monument Signs, maintaining the Association Maintained Lots as described in Section 3.07 hereof, administering the affairs of the Association, paying the Association Maintained Lot Expenses and the Community Expenses, including, without limitation, any expense authorized by the Board and recommended by the Windmill Creek Committee, and accumulating reserves for any such expenses.

6.02 <u>COMMUNITY ASSESSMENT</u>: Each year on or before December 1, the Board shall adopt and furnish each Owner with a budget for the ensuing calendar year, which shall show the following with reasonable explanations and itemizations:

  (1)   The estimated Community Expenses;

  (2)   The estimated amount, if any, to maintain adequate reserves for Community Expenses including, without limitation, amounts to maintain the Capital Reserve;

  (3)   The estimated net available cash receipts from the operation and use of the Community Area, plus estimated excess funds, if any, from the current year's assessments;

  (4)   The amount of the "Community Assessment" payable by the Owners, which is hereby defined as the amount determined in (1) above, plus the amount determined in (2) above, minus the amount determined in (3) above;

  (5)   That portion of the Community Assessment which shall be payable with respect to the ensuing calendar year by the Owner of each Lot which is subject to assessment hereunder, which shall be equal to the Community Assessment divided by the number of Lots, so that each Owner shall pay equal Community Assessments for each Lot owned. The Community Assessment shall be paid in periodic installments as determined by the Board from time to time, but no less frequently than once each calendar year.

6.03 ASSOCIATION MAINTAINED LOT ASSESSMENT: Each year on or before December 1, the Board shall adopt and furnish each Owner of an Association Maintained Lot with a budget for the ensuing calendar year, which shall show the following with reasonable explanations and itemizations:

(1) The estimated Association Maintained Lot Expenses;

(2) The estimated amount, if any, to maintain adequate reserves for Association Maintained Lot Expenses;

(3) The estimated net available cash receipts from the operation and use of the Association Maintained Lots, plus estimated excess funds, if any, from the current year's assessments;

(4) The amount of the "Association Maintained Lot Assessment" payable by the Owners of Association Maintained Lots, which is hereby defined as the amount determined in (1) above, plus the amount determined in (2) above, minus the amount determined in (3) above;

(5) That portion of the Association Maintained Lot Assessment which shall be payable with respect to the ensuing calendar year by the Owner of each Association Maintained Lot which is subject to assessment hereunder, which shall be equal to the Association Maintained Lot Assessment divided by the number of Association Maintained Lots, so that each Owner of an Association Maintained Lot shall pay equal Association Maintained Lot Assessments for each Association Maintained Lot owned. The Association Maintained Lot Assessment shall be paid in periodic installments as determined by the Board from time to time, but no less frequently than once each calendar year.

Anything in this Section to the contrary notwithstanding, during the Initial Development Period the assessment procedure set forth in Section 6.10 shall apply and the budget provided for in this Section need not disclose the information called for in Subsection (5) above.

6.04 PAYMENT OF COMMUNITY ASSESSMENT: Each Owner of a Lot which is subject to assessment shall pay to the Association, or as the Board may direct, that portion of the Community Assessment which is payable by each Owner of a Lot under Section 6.02(5) or Section 6.10, as applicable, at such times as the Board shall determine from time to time.

6.05 PAYMENT OF ASSOCIATION MAINTAINED LOT ASSESSMENT: Each Owner of an Association Maintained Lot which is subject to assessment shall pay to the Association, or as the Board may direct, that portion of the Association Maintained Lot Assessment which is payable by each Owner of an Association Maintained Lot under Section 6.03(5) or Section 6.10, as applicable, at such times as the Board shall determine from time to time.

6.06 <u>REVISED ASSESSMENT</u>: If after the Initial Development period the Community Assessment and/or the Association Maintained Lot Assessment proves inadequate for any reason (including nonpayment of any Owner's assessment) or proves to exceed funds reasonably needed, then the Board may increase or decrease the assessment payable under Section 6.02(5) or Section 6.03(5), as the case may be, by giving written notice thereof (together with a revised budget and explanation for the adjustment) to each affected Owner not less than ten (10) days prior to the effective date of the revised assessment.

6.07 <u>SPECIAL ASSESSMENT</u>: After the Initial Development Period (defined in Section 6.10 below) the Board may levy a special assessment as provided in this Section (i) to pay (or build up reserves to pay) expenses other than Community Expenses incurred (or to be incurred) by the Association from time to time for a specific purpose including, without limitation, to make alterations, additions or improvements to the Community Area, or any other property owned or maintained by the Association; or (ii) to cover an unanticipated deficit under the prior year's budget. Any special assessment shall be levied against all of Lots in equal shares. No special assessment shall be adopted without the affirmative vote of Voting Members representing at least two-thirds (2/3) of the votes cast on the question. The Board shall serve notice of a special assessment on all Owners by a statement in writing giving the specific purpose and reasons therefor in reasonable detail, and the special assessment shall be payable in such manner and on such terms as shall be fixed by the Board. Any assessments collected pursuant to this Section (other than those to cover an unanticipated deficit under the prior year's budget) shall be segregated in a special account and used only for the specific purpose set forth in the notice of assessment.

6.08 <u>CAPITAL RESERVE</u>:

(a) The Association shall segregate and maintain special reserve accounts to be used solely for making capital expenditures in connection with the Community Area (the "Capital Reserve"). The Board shall determine the appropriate level of the Capital Reserve based on a periodic review of the useful life of improvements to the Community Area and other property owned by the Association and periodic projections of the cost of anticipated major repairs or replacements to the Community Area and the purchase of other property to be used by the Association in connection with its duties hereunder. Each budget shall disclose that percentage of the Community Assessment which shall be added to the Capital Reserve and each Owner shall be deemed to make a capital contribution to the Association equal to such percentages multiplied by each installment of the Community Assessment paid by such Owner.

(b) To the extent required by the Permit (defined in Section 3.05) or otherwise by the Corps (defined in Section 3.05), the Association shall maintain a reserve for the maintenance, management, monitoring or other required action with respect to the Wetlands (defined in Section 3.05) ("Wetland Reserve").

6.09 <u>INITIAL CAPITAL CONTRIBUTION</u>: Upon the closing of the first sale of a Lot by the Declarant to a purchaser for value, the purchasing Owner shall make a capital contribution to the Association in an amount equal to one year (twelve months) of the Community

12

Assessment at the rate which shall become effective with respect to the Lot as of the closing. Said amount shall be held and used by the Association for its working capital needs. Upon the closing of the first sale of an Association Maintained Lot by the Declarant to a purchaser for value, the purchasing Owner shall make a capital contribution to the Association in an amount equal to one year (twelve months) of the Association Maintained Lot Assessment at the rate which shall become effective with respect to such Lot as of the closing. Said amount shall be held and used by the Association for payment of Association Maintained Lot Expenses.

6.10 ASSESSMENTS DURING INITIAL DEVELOPMENT PERIOD: Anything herein to the contrary notwithstanding, from the date of the Recording of this Declaration until the first meeting of the Voting Members after the Turnover Date (the "Initial Development Period"), the assessment procedure set forth in this Section shall apply.

(a) The Index. For purposes hereof: (i) the "Index" shall be the level of the most recently published Consumer Price Index, United States City Average, All Urban Consumers, All Items (1982-84 = 100) as published from time to time by the Bureau of Labor Statistics or if the Index shall cease being published, such other index or standard designated by the Declarant, in its discretion, as shall most nearly approximate the measurements theretofore made by the Index shall be used as the Index hereunder and the Index Base Level (hereinafter defined) shall be adjusted accordingly; (ii) the "Index Base Level" shall be 157; and (iii) the "Index Ratio" shall be a fraction, the numerator of which shall be the most recently published level of the Index and the denominator of which shall be the Index Base Level.

(b) Owner's Obligations. Each year or portion thereof during the Initial Development Period each Owner (other than the Declarant) shall pay as his Community Assessment with respect to each Lot owned by the Owner, the amount designated from time to time by the Board, which amount, on an annualized basis, shall not be greater than $300.00 multiplied by the Index Ratio. Each year or portion thereof during the Initial Development Period each Owner of an Association Maintained Lot (other than the Declarant), shall also pay as his Association Maintained Lot Assessment with respect to each Association Maintained Lot owned by the Owner, the amount designated from time to time by the Board, which amount, on an annualized basis, shall not be greater than $125.00 multiplied by the Index Ratio. Payments shall be made periodically as determined by the Board from time to time, but not less frequently than once each year. Out of each such Community Assessment payment, the Association shall add that portion of the payment which is designated in the budget as a capital contribution under Section 6.08 to the Capital Reserve. The balance of each such Community Assessment payment shall be used by the Association to pay the Community Expenses.

(c) Declarant's Obligation. During the Initial Development Period the Declarant shall not be obligated to pay any amounts to the Association as a Community Assessment or as an Association Maintained Lot Assessment, except as provided in this Subsection. The Declarant shall pay to the Association the aggregate excess, if any, of the Community Expenses incurred and paid during the Initial Development Period over

13

the aggregate amounts assessed to the Owners (other than Declarant) for use by the Association for the payment of Community Expenses under Subsection (b) during the Initial Development Period. The Declarant shall also pay to the Association the aggregate excess, if any, of the Association Maintained Lot Expenses incurred and paid during the Initial Development Period over the aggregate amounts assessed to Owners of Association Maintained Lots for use by the Association for the payment of Association Maintained Lot Expenses under Subsection (b) during the Initial Development Period. The Declarant shall not be responsible for the payment of any amounts to the Capital Reserve during the Initial Development Period. The Declarant shall make such payments to the Association as needed during such period and a final accounting shall be made between Declarant and the Association within 180 days after the end of the Initial Development Period. If Declarant fails to pay any amounts due under this Subsection (c), the amount thereof shall be a lien against Lots owned by Declarant as provided in Article Seven.

6.11 PAYMENT OF ASSESSMENTS: Assessments levied by the Association shall be collected from each Owner by the Association and shall be a lien on the Owner's Lot and also shall be a personal obligation of the Owner in favor of the Association, all as more fully set forth in Article Seven.

## ARTICLE SEVEN
### Collection of Charges and Remedies for Breach or Violation

7.01 CREATION OF LIEN AND PERSONAL OBLIGATION: The Declarant hereby covenants, and each Owner of a Lot by acceptance of a deed therefor (whether or not it shall be so expressed in any such deed or other conveyance) shall be and is deemed to covenant and hereby agrees to pay to the Association all Charges made with respect to the Owner on the Owner's Lot. Each Charge, together with interest thereon and reasonable costs of collection, if any, as hereinafter provided, shall be a continuing lien upon the Lot against which such Charge is made and also shall be the personal obligation of the Owner of the Lot at the time when the Charge becomes due. The lien or personal obligation created under this Section shall be in favor of and shall be enforceable by the Association.

7.02 COLLECTION OF CHARGES: The Association shall collect from each Owner all Charges payable by such Owner under this Declaration.

7.03 NON-PAYMENT OF CHARGES: Any Charge which is not paid to the Association when due shall be deemed delinquent. Any Charge which is delinquent for thirty (30) days or more shall bear interest at the rate of eighteen percent (18%) per annum or the maximum rate permitted by law, whichever is less, from the due date to the date when paid. The Association may (i) bring an action against the Owner personally obligated to pay the Charge to recover the Charge (together with interest, costs and reasonable attorney's fees for any such action, which shall be added to the amount of the Charge and included in any judgment rendered in such action), and (ii) enforce and foreclose any lien which it has or which may exist for its benefit. In

addition, the Board may add a reasonable late fee to any installment of an assessment which is not paid within thirty (30) days of its due date. No Owner may waive or otherwise escape personal liability for the Charges hereunder by nonuse of the Community Area or by abandonment or transfer of his Lot.

7.04 LIEN FOR CHARGES SUBORDINATED TO MORTGAGES: The lien for Charges, provided for in Section 7.01, shall be subordinate to the Mortgagee's mortgage on the Lot which was Recorded prior to the date that any such Charge became due. Except as hereinafter provided, the lien for Charges, provided for in Section 7.01, shall not be affected by any sale or transfer of a Lot. Where title to a Lot is transferred pursuant to a decree of foreclosure of the Mortgagee's mortgage or by deed or assignment in lieu of foreclosure of the Mortgagee's mortgage, such transfer of title shall extinguish the lien for unpaid Charges which became due prior to the date of the transfer of title. However, the transferee of the Lot shall be personally liable for his share of the Charges with respect to which a lien against his Lot has been extinguished pursuant to the preceding sentence where such Charges are reallocated among all the Owners pursuant to a subsequently adopted annual or revised Community Assessment or special assessment, and non-payment thereof shall result in a lien against the transferee's Lot, as provided in this Article.

7.05 SELF-HELP BY BOARD: In the event of a violation or breach by an Owner of the provisions, covenants or restrictions of the Declaration, the By-Laws, or rules or regulations of the Board, where such violation or breach may be cured or abated by affirmative action, then the Board, upon not less than ten (10) days' prior written notice to the Owner, shall have the right to enter upon that part of the Premises where the violation or breach exists to remove or rectify the violation or breach; provided, that, if the violation or breach exists within a Home, judicial proceedings must be instituted before any items of construction can be altered or demolished.

7.06 OTHER REMEDIES OF THE BOARD: In addition to or in conjunction with the remedies set forth above, to enforce any of the provisions contained in this Declaration or any rules and regulations adopted hereunder the Board may levy a fine or the Board may bring an action at law or in equity by the Association against any person or persons violating or attempting to violate any such provision, either to restrain such violation, require performance thereof, to recover sums due or payable or to recover damages or fines, and against the land to enforce any lien created hereunder; and failure by the Association or any Owner to enforce any provision shall in no event be deemed a waiver of the right to do so thereafter.

7.07 COSTS AND EXPENSES: All costs and expenses incurred by the Board in connection with any action, proceedings or self-help in connection with exercise of its rights and remedies under this Article, including, without limitation, court costs, attorneys' fees and all other fees and expenses, and all damages, liquidated or otherwise, together with interest thereon at the rate of eighteen percent (18%) per annum or the maximum rate permitted by law, whichever is less, until paid, shall be charged to and assessed against the defaulting Owner, and the Association shall have a lien for all the same, upon his Lot as provided in Section 7.01.

7.08 ENFORCEMENT BY OWNERS: Enforcement of the provisions contained in this Declaration and the rules and regulations adopted hereunder may be by any proceeding at law or in equity by any aggrieved Owner against any person or persons violating or attempting to violate any such provisions, either to restrain such violation or to recover damages, and against a Lot to enforce any lien created hereunder.

7.09 RIGHTS OF VILLAGE. In the event of a default by any of the parties subject to these Declarations, the Village shall have the right, but not the duty, to do the following:

(a) The Village shall notify the Declarant or the Association (whichever is appropriate) of the existence and nature of the default;

(b) If the recipient of the default notice does not take steps to cure the default within thirty (30) days after receipt of such notice from the Village, then the Village shall have the right, but not the duty, to enforce the terms of this Declaration;

(c) Any costs of enforcement shall be paid to the Village by the defaulting party in an amount equal to three times the amount of the costs incurred by the Village; and

(d) The Village shall have the rights set forth in Section 7.08 above, which shall include, without limitation, the rights set forth in this Article VII.

## ARTICLE EIGHT
### Use Restrictions

8.01 INDUSTRY/SIGNS: No industry, business, trade, occupation or profession of any kind shall be conducted, maintained or permitted on any part of the Community Area nor shall any "For Sale" or "For Rent" signs or any other advertising be maintained or permitted on any part of the Community Area, except as permitted by the Board or as permitted under Article Nine.

8.02 UNSIGHTLY USES: No clothes, sheets, blankets, laundry of any kind or other articles shall be hung out on any portion of the Lot or the Community Area; except, that laundry may be hung in the back yard of the Lot. The Premises shall be kept free and clear of all rubbish, debris and other unsightly materials and no waste shall be committed thereon. All rubbish shall be deposited in such areas and such receptacles as shall be designated by the Board.

8.03 RESIDENTIAL USE ONLY: Each Home shall be used only as a residence; provided that no Owner shall be precluded, with respect to his Home, from (i) maintaining a personal professional library, (ii) keeping his personal business records or accounts therein or (iii) handling his personal business or professional calls or correspondence therefrom.